**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION**

| | |
|---|---|
| **JALA ELIZABETH SMITH,** )<br>)<br>**Plaintiff,** )<br>)<br>vs. )<br>)<br>**ANDREW SAUL,** )<br>**Commissioner of Social Security,** )<br>)<br>**Defendant.** ) | 6:18-cv-00926-RDP |

**MEMORANDUM OF OPINION**

**I.    Introduction**

Plaintiff, Jala E. Smith, appeals from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). Ms. Smith timely pursued and exhausted her administrative remedies and the decision of the Commissioner is ripe for review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Plaintiff was 34 years old at the time of the Administrative Law Judge's ("ALJ's") decision, and she has her GED. (Tr. at 92.) Her past work experiences include employment as a certified nursing assistant, cashier, and fast food worker. (*Id.* at 93-94.) Ms. Smith claims that she became disabled on July 9, 2016, due to severe chronic migraines, dizziness, muscles spasms, nausea, anxiety, depression, numbness to body and face, confusion, and blackout spells. (*Id.* at 233, 95-96, 258.)

The Social Security Administration ("SSA") has established a five-step sequential evaluation process for determining whether an individual is disabled and thus eligible for DIB or

SSI. *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The evaluator will follow the steps in order until making a finding of either disabled or not disabled; if no finding is made, the analysis will proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step requires the evaluator to determine whether the plaintiff is engaged in substantial gainful activity ("SGA"). *See id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the plaintiff is not engaged in SGA, the evaluator moves on to the next step.

The second step requires the evaluator to consider the combined severity of the plaintiff's medically determinable physical and mental impairments. *See id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements set forth in 20 C.F.R. §§ 404.1509 and 416.909 will result in a finding of not disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The decision depends on the medical evidence contained in the record. *See Hart v. Finch*, 440 F.2d 1340, 1341 (5th Cir. 1971) (concluding that "substantial medical evidence in the record" adequately supported the finding that plaintiff was not disabled).

Similarly, the third step requires the evaluator to consider whether the plaintiff's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the criteria of a listed impairment and the durational requirements set forth in 20 C.F.R. §§ 404.1509 and 416.909 are satisfied, the evaluator will make a finding of disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the plaintiff's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluator must determine the plaintiff's residual functional capacity ("RFC") before proceeding to the fourth step. *See id.* §§ 404.1520(e), 416.920(e). The fourth step

requires the evaluator to determine whether the plaintiff has the RFC to perform the requirements of his past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the plaintiff's impairment or combination of impairments does not prevent him from performing his past relevant work, the evaluator will make a finding of not disabled. *See id.*

The fifth and final step requires the evaluator to consider the plaintiff's RFC, age, education, and work experience in order to determine whether the plaintiff can make an adjustment to other work. *See id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the plaintiff can perform other work, the evaluator will find him not disabled. *Id.*; *see also* 20 C.F.R. §§ 404.1520(g), 416.920(g). If the plaintiff cannot perform other work, the evaluator will find him disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

Applying the sequential evaluation process, the ALJ found that Ms. Smith has not engaged in SGA since the alleged onset of her disability. (Tr. at 64.) According to the ALJ, Plaintiff's depression, migraine headaches, and obesity are considered "severe" based on the requirements set forth in the regulations. (*Id.*) However, she found that these impairments neither meet nor medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 65.) The ALJ determined that Ms. Smith has the following RFC: medium work, including lifting and/or carrying fifty pounds occasionally and twenty-five pounds frequently; sitting for six hours; standing and/or walking for six hours; pushing/pulling as much as she can lift/carry; climbing ramps and stairs frequently, but never climbing ladders, ropes, or scaffolding; frequently balancing, stooping, kneeling, crouching, and/or crawling; avoiding unprotected heights or moving mechanical parts; performing simple, routine tasks; making simple work-related decisions; and only occasionally interacting with the with general public. (*Id.* at 66.)

3

According to the ALJ, Ms. Smith is unable to perform any of her past relevant work. (Tr. at 72.) She determined that Plaintiff's "transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled." (*Id*. at 73.) Because Plaintiff cannot perform the full range of medium work, the ALJ enlisted a vocational expert ("VE") and used Medical-Vocation Rule 203.28 as a guideline for finding that there are a significant number of jobs in the national economy that she is capable of performing, such as hand packager, laundry worker, and cleaner. (*Id*.) The ALJ concluded her findings by stating that Plaintiff "has not been under a disability, as defined in the Social Security Act, from July 9, 2016, through the date of this decision." (*Id*.)

## II. Standard of Review

This court's role in reviewing claims brought under the Social Security Act is a narrow one. The scope of its review is limited to determining (1) whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and (2) whether the correct legal standards were applied. *See Stone v. Comm'r of Soc. Sec*., 544 F. App'x 839, 841 (11th Cir. 2013) (citing *Crawford v. Comm'r of Soc. Sec*., 363 F.3d 1155, 1158 (11th Cir. 2004)). This court gives deference to the factual findings of the Commissioner, provided those findings are supported by substantial evidence, but applies close scrutiny to the legal conclusions. *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).

Nonetheless, this court may not decide facts, weigh evidence, or substitute its judgment for that of the Commissioner. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004)). "The substantial evidence standard permits administrative decision makers to act with considerable latitude, and 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an

administrative agency's finding from being supported by substantial evidence.'" *Parker v. Bowen*, 793 F.2d 1177, 1181 (11th Cir. 1986) (Gibson, J., dissenting) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). Indeed, even if this court finds that the proof preponderates against the Commissioner's decision, it must affirm if the decision is supported by substantial evidence. *Miles*, 84 F.3d at 1400 (citing *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990)).

However, no decision is automatic, for "despite th[e] deferential standard [for review of claims], it is imperative that th[is] court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Moreover, failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

### III. Discussion

One of Ms. Smith's arguments in support of reversal is that the ALJ, in determining her RFC, failed to account for limitations caused by her migraine headaches, including failing to account for the multiple opinions of Dr. Arturo Otero, her treating neurologist, that she suffered from debilitating migraine headaches.[1] The court agrees that this case must be reversed and remanded on this ground.

#### A. Applicable Law

A claimant's RFC is an administrative finding as to the most the claimant can do despite the limitations from her impairments. *See* 20 C.F.R. §§ 404.1527(d), 404.1545(a), 416.927(d), 416.945(a). A claimant's RFC is reserved to the determination of the ALJ and is concluded based

---

[1] Plaintiff also contends that the ALJ erred in rejecting consultative examiner Brian Thomas, Psy.D's opinion.

on the relevant medical evidence and other evidence included in the case record. *See* 20 C.F.R. §§ 404.1545 (a)(3), 416.945 (a)(3). Statements by a physician are relevant to the ALJ's findings, but they are not determinative, as it is the ALJ who bears the responsibility for assessing a claimant's RFC. *See, e.g.,* 20 C.F.R. § 404.1546(c). A claimant's statements about the frequency, intensity, and duration of her symptoms will only impact her RFC to the extent they are consistent with other evidence of record. *See* 20 C.F.R. §§ 404.1529, 416.929 (describing the Commissioner's process for evaluating subjective complaints).

Eleventh Circuit case law provides that controlling weight must be given to the opinion, diagnosis and medical evidence of a treating physician absent good cause to do otherwise. *Crawford*, 363 F.3d at 1159–1160; *Phillips*, 357 F.3d at 1240–1241; 20 C.F.R. § 404.1527(d)(2). "[G]ood cause exists when the (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.3d at 1240–1241. When a treating physician's opinion does not warrant controlling weight, the ALJ must clearly articulate his reasons, which must also be legally correct and supported by substantial evidence in the record. *Crawford*, 363 F.3d at 1159–60; *Lamb v. Bowen*, 847 F.2d 698, 703–704 (11th Cir. 1988).

**B.     Record Evidence**

A recitation of Smith's medical history with regard to her migraine headaches is warranted. Smith has suffered from migraines since she was a child, but in early March 2016, her headaches worsened. (Tr. at 403.) An examination by her treating physician at Vernon Medical Clinic revealed that she was tender to palpation over the cervical spine muscles, with muscle spasms in her neck. She was prescribed Toradol, Zanaflex, and Xanax. (Tr. at 366-69.) Later in March, her left-sided scalp pain continued, but a CT of her head was normal. (Tr. at 361.) She reported that

she had occasional migraines, and although she had taken Imitrex in the past, it was too expensive, but she was willing to try it again. Topamax and Imitrex were prescribed for her migraine and tension headaches. (Tr. at 362-64.)

By early April 2016, Smith's headaches were better, and her scalp pain had resolved because she'd cut her hair very short. (Tr. at 356.) She was assessed with improved migraine headache and Topamax was increased. (Tr. at 359.) However, later in April, Smith continued having severe frequent headaches. She'd tried everything she'd been offered with little relief and wanted a referral to a neurologist. Her examination was normal except for tenderness to palpation over the cervical spine muscles. (Tr. at 351-53.) She was assessed with chronic, recurrent headache and neck pain, Imitrex was refilled, and she was referred to a neurologist. (Tr. at 354.)

Smith began treatment with neurologist, Arturo Otero, M.D., in July 2016. He treated her through at least August 2017, and he diagnosed intractable migraine headaches and spasms. (Tr. at 391-413, 414-18, 422-70, 471-73, 550-56.) His treatment notes document that Smith said she had daily migraines that were experienced any time of the day. They were located occipitally and cervically, severe in intensity (8-10/10), with pounding and throbbing, and associated symptoms of photophobia, nausea, vomiting, phonophobia, hot temperatures, and excessive psychological stress. Smith had a family history of similar headaches and a history of them as a child. Her migraines were exacerbated by lack of sleep, noise, stress, weather changes, and hot temperatures, and alleviated by rest, sleep, relaxation, vomiting, decreased activity, and quiet. (Tr. at 403.) Preventative medications such as Topamax weren't helpful; abortive medication, like Imitrex, was helpful; and Excedrin Migraine, Ibuprofen, and Naprosyn were not helpful. (*Id.*)

Related to the headaches, Dr. Otero's notes reflect that Smith also had severe spasms affecting her from the occiput/neck all the way to the lumbar spine. Episodes lasted an entire day

and occurred spontaneously, with duration of two months, (i.e., since about May 2016). (*Id.*) She'd had instances of her hands and feet becoming paresthetic on a frequent basis, and her sleep was poor, fragmented, and interrupted. (*Id.*) Dr. Otero increased some of her medications, added Neurontin, ordered MRIs of her brain and cervical spine, and ordered nerve conduction studies of her bilateral upper and lower extremities. (Tr. at 404.)

In January 2017, Dr. Otero documented that Smith had dizziness caused by extreme head pain (tr. at 428), blurred vision caused by intense headaches (tr. at 428-29), spasms affecting her entire body (tr. at 423), and headache paroxysms daily with pain severe enough that she didn't trust herself to drive. (Tr. at 495). He noted that her migraines worsened in October 2016 and she'd received parenteral therapy which didn't last more than an hour, that her headaches were nonresponsive to over-the-counter NSAIDs, that she had at least one episode of early morning decreased visual acuity lasting for ten minutes, followed by a severe migraine headache (tr. at 417), and that she experienced a severe headache followed by pronounced atonia, or decreased muscle tone, (tr. at 459) in her upper and lower extremities that caused her to fall because she couldn't move her legs and was unable to stand for about five to ten minutes. She suffered a severe right ankle sprain as a result. (*Id*.)

By February 2017, he noted that Smith had episodes of generalized spasms that came in paroxysms, at times severe enough she couldn't walk, and that affected her entire body and limbs. (Tr. at 423.) She also had acroparesthesias and hypoestesias that seemed to be increasing. (*Id.*) Dr. Otero was concerned about her episodes of generalized weakness and spasms of the entire body, so he referred her to UAB Neurology to determine if she had stiff person syndrome. (Tr. at 425, 474.)

In June 2017, Dr. Otero noted that Smith was still having spasms of the upper and lower extremities and cervical and thoracic spines with exertion, despite Tizanidine helping her spasms. (Tr. at 554.) She weighed 267.5 pounds with a BMI of 44.51, and physical examination was normal. (Tr. at 555.)

Over the time he treated her, Dr. Otero ordered multiple objective tests that were essentially negative (tr. at 406, 408, 450, 573-74), with the exception of an MRI of her cervical spine that showed mild neural foraminal narrowing on the right at C4-C5 and C5-C6. (Tr. at 407.) He prescribed multiple medications to try to alleviate Smith's migraine headache pain. (Tr. at 395-96, 428-29.) Dr. Otero also stated several times, beginning in September 2016, that Smith could not work due to her medical condition. (Tr. at 395.) He reiterated in October 2016 that Smith was not able to work, that she would have difficulty performing plain housework. (Tr. at 416.) In February 2017, he said she was not capable of holding meaningful gainful employment. (Tr. 425.) He completed a medical source statement in February stating that Smith couldn't sustain work activity on a regular and continuing basis due to severe migraines, and that she'd likely miss two or more days a month, and he cited objective evidence of her severe pain behavior and various ER visits. (Tr. at 471-72.)

In May 2017, Smith saw neurologist, Ikjae Lee, M.D., on referral from Dr. Otero, for muscle spasms that started with bad headaches. (Tr. at 577.) Dr. Otero wanted him to determine if she had stiff person syndrome. Smith reported severe head pain that lasted for days, with blurry vision or dark vision, that got better with resting or a Phenergan shot. (*Id.*) She had headaches at least two to three times a week, muscle spasms in her neck and back that worsened the headaches, and spasms in her arms and legs, with pain in the muscles when the spasms ended, typically within five minutes. (*Id.*) This happened off and on all day, about 15 times a day. She had intermittent

tingling in her fingers and in her legs, feet, and calf, and back pain that radiated to both legs. (Tr. at 578-79.) Her physical and neurological examination was normal. (*Id.*) Dr. Lee's impression was muscle spasm, paresthesia, chronic headache, chronic neck and back pain, and obesity, with a worsening course. Lab tests and an EMG/NCS test were normal. (Tr. at 582.)

In August 2017, Dr. Lee ordered a brain MRI, which showed some abnormal findings that were thought to be incidental, but there was no significant change since the prior MRI in July 2016. (Tr. at 552.) Smith's complaints were unchanged and her muscle spasms had decreased her daily functioning. Despite Tizanidine, which was helping some, her spasms were worsening. She had to lie down when she got the spasms. (Tr. at 557.) Dr. Lee's diagnoses were unchanged. He didn't believe she had stiff person syndrome or a neuromuscular cause for the spasms. It seemed quite bizarre to him to have spasms that come with numbness. (Tr. at 562.) He suggested Smith drink quinine for the spasms. (*Id.*)

Treatment notes from a treating nurse in 2017 document Smith's continuing migraines and muscle spasms. In April 2017, Smith started treatment with Lou Ann Hubbard, CRNP, for headaches, dizziness, swelling, muscle spasms in her lower back, chest pain, and seeing amber. (Tr. at 604). A chest x-ray showed slightly increased lung volumes. (Tr. at 606). Later that month, Smith felt better after starting Lasix and Zanaflex. She weighed 276.5 pounds with a BMI of 46.01. Ms. Hubbard's assessment included near syncope, and panic attacks. Paxil was started. (Tr. at 601-02.) In September 2017, Ms. Hubbard's assessment was chronic vertigo, swelling, bilateral headaches, chronic nausea, and tiring easily. (Tr. at 596-97.) Steroids, diuretics, and anti-nausea medications were started. (Tr. at 597.)

Smith was also seen at various emergency room departments after her onset date because of her migraines, spasms, and atypical chest pain. At a visit in December 2016, she had visual

phenomena indicative of photopsias and muscle spasms in all her limbs, especially in the right arm and neck. (Tr. at 430). Diagnoses included intractable migraine and paresthesias, and numbness. (Tr. at 431.) In February 2017, she presented to an emergency department again with worsening body spasms and headache at an 8/10 intensity level, saying that her medications weren't helping. (Tr. at 533.) At a visit in March 2017, she had body swelling, pain, headache, vomiting, fluid build up, and nausea. (Tr. at 527.) Reflexes in her feet were hyperreflexic, and a chest x-ray showed chronic elevation of the right hemidiaphragm, but no acute lung disease. (Tr. at 529-31.) In July 2017, Smith presented at the emergency department with trouble staying awake, dizziness, slurred speech, gait problems, and near syncope for more than one week. (Tr. at 511.) Her examination, and all tests were normal, and the impression was dizziness with gait difficulty, near syncope, and speech problems. (Tr. at 513-14, 516-517, 573-74.)

A psychological consultative examination and a post-hearing physical consultative examination also document Smith's headache and muscle spasm complaints. In October 2016, Brian Thomas, Psy.D. performed a psychological evaluation of Smith on behalf of the Social Security Administration. (Tr. at 420.) She complained of pain, dizziness, and blackouts that interfered with driving. After a mental status examination and interview, Dr. Thomas diagnosed major depressive disorder, panic disorder with agoraphobia, but ruled out somatic symptom disorder. He said her ability to perform routine and repetitive tasks is fair, but her consistency is probably poor. (*Id.*) She had a fair ability to sustain attention, interact with coworkers, and to handle funds, and her ability to receive supervision was adequate. (*Id.*)

Post-hearing, in October 2017, Smith was examined by consultant Hakim Hisham, M.D. (Tr. at 608.) She reported severe, painful headaches with associated nausea and vomiting, light and sound sensitivity, and sometimes balance problems. Her headaches were daily, with very

11

severe headaches about four to five days a month, which lasted several hours and sometimes longer. Movement tended to trigger her headaches. (Tr. at 609.) Dr. Hisham's examination revealed blurred optic discs on both sides and tenderness of the trapezius muscle and shoulder girdle, and in the occipital nerve. (*Id.*) Her neck range of motion was slightly decreased with discomfort. (Tr. at 610.) Dr. Hisham's impression was headache that seemed to be a combination of migraine features, questionable pseudo-tumor was a consideration, chronic daily headache, and morbid obesity. (*Id.*) Dr. Hisham did not dispute the frequency of Smith's headaches.

Smith's testimony of her limitations from her migraines and related problems is consistent with what she reported to doctors. At Smith's hearing, she stated that she has daily migraines, some more severe than others, but the ones she has daily usually last a couple hours and she has to lie down, and is weak after them. (Tr. at 95.) When she has them she stays in a dark room with her air conditioners and a fan on her, keeping her cool so the migraine won't be so intense. They last from start to finish anywhere from two to six hours. (Tr. at 102-03.) She stated that at the time of her hearing, she was taking over-the-counter Excedrin Migraine because her doctor had taken her off Sumatriptan, but she was going back to see him on the ninth, which was five days after the hearing, to see how the Excedrin Migraine had helped—she said they were doing a trial with the medications. (Tr. at 95-96.)

While the frequency of Smith's migraines varied over time, she never reported fewer than two to three a week with pain sometimes lasting for days, and while their intensity varied, she did not report fewer than four to five very severe migraines a month, with daily headaches.

C. **The ALJ's Decision**

As noted above, the ALJ found that Smith's migraine headaches, depression, and obesity are severe impairments at step two of the evaluation but that they did not meet or equal a Listing

of impairments at step three. Within her RFC finding, the ALJ broadly stated that Smith's descriptions of her symptoms and limitations has generally been "inconsistent and unpersuasive." (Tr. at 68.) Also within the RFC, the ALJ rejected the multiple opinions of Dr. Otero that Smith suffers from severe migraines that are disabling because there was no objective evidence to support his opinions. (*Id.* ("Dr. Otero's opinion is not supported by the evidence or by the treatment notes, in particular, by the objective findings, which are all normal.").

### D. Discussion

After careful review, the court concludes it was reversible error for the ALJ to reject Dr. Otero's opinions. In addition, the ALJ failed to account for Smith's migraines in determining her RFC. Neither the Social Security Administration nor the federal courts requires that an impairment, including migraines, be proven through objective clinical findings. *See, e.g., Thompson v. Barnhart*, 493 F. Supp. 2d 1206, 1215 (M.D. Fla. 2010); *Ortega v. Chater*, 933 F. Supp. 1071, 1075 (S.D. Fla. 1996) (noting that "present-day laboratory tests cannot prove the existence of migraine headaches[ ]" and holding that an ALJ improperly discounted a treating physician's opinion that a claimant was disabled by migraines, despite the fact that there were no laboratory tests confirming the existence or severity of the headaches, where the opinion of the treating physician was consistent, extensive, and substantiated by objective medical evidence that the claimant suffered from symptoms that were associated with severe migraine headaches); *Stebbins v. Barnhart*, 2003 WL 23200371, *10–11 (W.D. Wis. Oct. 21, 2003) (remanding the ALJ's decision because it was based on errors, "foremost of which was a fundamental misunderstanding of the diagnosis and treatment of migraine headaches[ ]"); *Diaz v. Barnhart*, 2002 WL 32345945, *6 (E.D. Pa. Mar. 7, 2002) (stating that migraines "do not stem from a physical or chemical abnormality which can be detected by imaging techniques or laboratory tests,

but are linked to disturbances in cranial blood flow [ ]"); *Federman v. Chater*, 1996 WL 107291, at *2 (S.D.N.Y. Mar. 7, 1996) (noting that because there is no test for migraines, "'when presented with documented allegations of symptoms which are entirely consistent with the symptomatology for evaluating the claimed disorder, the Secretary cannot rely on the ALJ's rejection of the claimant's testimony based on the mere absence of objective evidence[ ]'").

In *Thompson*, the court determined that the ALJ erred in declining to assign determinative weight to the treating physician's opinion that the plaintiff suffered from severe migraines because of the lack of clinical examination findings. 493 F. Supp. 2d at 1214-15. The court stated that the treating physician set forth "medical signs and symptoms sufficient to justify his diagnoses and treatment of the same." *Id.* at 1215. It concluded that based upon the totality of the evidence, the ALJ's reasons for discounting the opinion of the claimant's treating physician were not based on substantial evidence. *Id.*

The same is true here. Indeed, there is no actual test to diagnose migraine headaches. CT or MRI scans cannot be used to diagnose them. *See* Migraine diagnosis, http://www.migrainetrust.org/living-with-migraine/seeking-medical-advice/diagnosis/ (visited September 11, 2019). A proper diagnosis in this area depends on a doctor taking a medical history and ruling out other causes for the headaches. *See id.* To make a firm diagnosis, a detailed history of the headaches and/or other symptoms is taken, which includes analyzing the features of the headaches, i.e., how often they happen, how severe the pain is, what symptoms go with them, the effect the headaches have in everyday activities, and the family history of headaches. *See id.* Then a thorough examination is carried out, including a complete neurological assessment. *See id.* Dr. Otero, Plaintiff's treating neurologist, took these steps in making his diagnosis of intractable migraine headaches. (Tr. at 394, 396, 400, 405, 418, 425, 429, 431, 461, 471, 556.) And the record,

as described above, reveals that since March 2016, there have been multiple references to Plaintiff's continuing treatment for and continuing complaints of, migraines, associated with symptoms such as nausea, spasms, blurred vision, aura, photophobia, phonophobia, flashes of light, etc., and for which she has been prescribed a variety of medications (e.g., Imitrex, Topamax, Excedrin Migraine, Toradol, Zanaflex, Xanax, Ibuprofen, and Naprosyn). Indeed, in almost every medical record and at almost every medical appointment/treatment, Plaintiff's migraines or history of treatment for migraines, were at least noted, but more often than not, her migraines were actually assessed—even when she sought treatment for a different medical problem. The ALJ, however, failed to acknowledge the abundant documentation of migraine diagnoses, symptoms, and signs as being "objective" evidence to support Dr. Otero's opinion. Indeed, the ALJ found that Dr. Otero's opinion was inconsistent with "normal" objective examination results and testing, but the ALJ did not suggest what objective evidence should be shown to verify the existence of migraines beyond what was shown. In his brief, the Commissioner does not respond to Plaintiff's argument that objective medical testing does not diagnose migraines, merely reiterating that Plaintiff's cranial MRI, nerve conduction study, and physical exams were normal. (Doc. 16 at 8.)

The ALJ also made a broad statement that Smith's description of her symptoms and limitations has generally been inconsistent and unpersuasive, but failed to indicate what record evidence was inconsistent in Smith's statements about her migraine headaches. The ALJ said there were inconsistencies in Smith's reports about the effectiveness of her medications, because while she reported at one point to Dr. Otero that Excedrin Migraine wasn't effective, as of the hearing date she was taking that medicine. (Tr. at 95-96.) But Smith stated at her hearing that she was taking Excedrin Migraine at the time because her doctor, who she would see five days later, had taken her off Sumatriptan and was trying her on Excedrin Migraine to see if it would help. (*Id.*)

The ALJ also rejected Smith's limitations because of her self-reported daily activities, which she said included taking care of her personal needs, preparing basic meals, playing with her children, and helping her children get ready for school. However, Smith indicated that when she doesn't have a migraine, she can participate in the daily activities she indicated, albeit at a slower pace than in the past and with breaks. (Tr. at 276, 277, 279, 287, 289.) The ALJ didn't factor in any limitation when Smith has a severe migraine or that she gets assistance from her mother with housework and shopping, her mother and step-dad help her with her children when she's not able, and they handle her finances for her. (Tr. at 70-71, 100-01, 287-89.)

Because the ALJ failed to acknowledge or evaluate the severity, duration, and/or frequency of Smith's severe migraines on her ability to perform work activity and rejected Dr. Otero's diagnoses that Smith suffered from intractable migraines because of the lack of corroborating objective evidence, her RFC assessment and decision are unsupported by substantial evidence. Remand is required for appropriate consideration of the evidence. To the extent the ALJ determines that Dr. Otero's opinions are not due controlling weight, she must not only articulate her reasons, but her reasons must be legally correct, and supported by substantial evidence in the record. *See, e.g., Crawford*, 363 F.3d at 1159–60. Additionally, upon remand, the ALJ should reassess Plaintiff's credibility. The ALJ's assessment of Plaintiff's credibility placed an undue emphasis on the absence of objective medical evidence. However, given the nature of chronic migraines, upon remand, the ALJ should reassess Plaintiff's credibility, giving due consideration to the need to go beyond objective medical evidence in properly evaluating such cases.[2]

---

[2] The ALJ's error, discussed above, is dispositive of this appeal. Therefore, it is unnecessary to address Plaintiff's remaining argument. *See* note 1, *supra*. *See also Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (on remand the ALJ must reassess the entire record); *McClurkin v. Soc. Sec. Admin.*, 625 F. App'x 960, 963 n.3 (11th Cir. 2015) (no need to analyze other issues when case must be reversed due to other dispositive errors).

## IV. Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and briefs of the parties, the decision of the Commissioner of Social Security denying Plaintiff's claims for DIB and SSI is **REVERSED** and **REMANDED** for further administrative proceedings consistent with this opinion. A separate closing order will be entered.

**DONE** and **ORDERED** this September 13, 2019.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE